**EXHIBIT "B"**

**DIP Term Sheet**

THE TERMS HEREIN ARE SUBJECT TO ACCEPTABLE DEFINITIVE DIP LOAN DOCUMENTATION AND APPROVAL BY THE BANKRUPTCY COURT.
08/03/09

# HILL COUNTRY GALLERIA, L.P.

## Term Sheet with respect to Pre-Petition and Post-Petition Secured Loans

This Term Sheet is intended as an outline only and does not purport to summarize all the conditions, covenants, representations, warranties and other provisions which would be contained in definitive legal documentation with respect to (i) the outstanding pre-petition loans and other pre-petition indebtedness of Hill Country Galleria, L.P. (the "Debtor" or "Borrower"), a Delaware limited partnership and the debtor-in-possession in a case filed pursuant to chapter 11 of the United States Bankruptcy Code in the Western District of Texas, Austin Division (Case No. 09-11175-cag) (the "Bankruptcy Proceedings") to Bank of America, N.A. and the other financial institutions party to that certain Construction Loan Agreement, dated July 27, 2006, among the Debtor, Bank of America, N.A., as agent bank (in that capacity, the "Agent"), and the other financial institutions from time to time party thereto (collectively, the "Pre-Petition Banks" or "Pre-Petition Lenders")[1] (as amended, modified, supplemented and/or restated from time to time, the "Loan Agreement") (such loans and other indebtedness being referred to herein collectively as the "Pre-Petition Secured Loans"), and (ii) the post-petition secured debtor-in-possession loans that the DIP Banks (as such term is hereinafter defined), are considering making to the Debtor in accordance with the terms hereof (the "DIP Loan"). The Pre-Petition Secured Loans and the DIP Loan are sometimes referred to herein collectively as the "Loans". Capitalized terms that are used, but not otherwise defined, herein shall have the respective meanings ascribed to such terms in the Loan Agreement.

| | |
|---|---|
| **DIP BORROWER:** | Hill Country Galleria, L.P., as debtor-in-possession in the Bankruptcy Proceedings, is/shall be the borrower as to all of the Loans. |
| **DIP AGENT:** | Bank of America, N.A. |
| **DIP BANKS and SPECIFIED PERCENTAGES OF DIP BANKS IN DIP LOAN:** | Bank of America, N.A. 29.023383769% |
| | Guaranty Bank 16.506189821% |
| | Key Bank National Association 11.004126547% |
| | Sovereign Bank 11.004126547% |
| | National City Bank 8.253094911% |

---

[1] The Pre-Petition Banks are comprised of the following financial institutions: (i) Bank of America, N.A.; (ii) Guaranty Bank; (iii) Key Bank National Association; (iv) Sovereign Bank; (v) Landesbank Hessen-Thuringen Girozentrale; (vi) National City Bank; (vii) The Northern Trust Company; (viii) Bank of Oklahoma, N.A.; (ix) Bank of the West; and (x) MidFirst Bank. The Pre-Petition Banks and the Banks are sometimes referred to herein collectively as the "Banks".

The Northern Trust Company 7.702888583%

Bank of Oklahoma, N.A 5.502063274%

Bank of the West 5.502063274%

MidFirst Bank 5.502063274%

| | |
|---|---|
| **CONFIRMATION OF PRE-PETITION LOANS AND LIENS:** | The Debtor shall acknowledge and reconfirm (i) the outstanding amount of the Pre-Petition Secured Loans (including all pre-petition interest, fees, charges and other amounts) (the "Pre-Petition Indebtedness") as of the date of commencement of the Bankruptcy Proceedings (the "Petition Date"), and (ii) the validity, enforceability, non-avoidability, and perfection of all liens, security interests and other encumbrances in favor of the Agent and/or the Pre-Petition Banks with respect to the Pre-Petition Secured Loans (the "Pre-Petition Security"). |
| **USE OF CASH COLLATERAL:** | Subject to the terms herein, Debtor shall be entitled to continue to use the Banks' cash collateral for necessary and reasonable operating expenses of Debtor, as approved in advance by the Banks, and pursuant to a mutually agreed upon budget, acceptable to the Debtor, the Agent, and the Banks only in accordance with the terms and provisions of agreed cash collateral orders which have or will be entered in the Bankruptcy Court. |
| **CONDITIONS PRECEDENT:** | The obligations of the DIP Banks to make the DIP Loan shall be subject to the continued satisfaction of the following conditions precedent:<br><br>(a) A final, nonappealable Order has been entered in the Bankruptcy Proceedings, approving all of the terms and provisions of the DIP Loan as set forth herein and in any definitive DIP Lending documents, all in a form and substance satisfactory to the Banks (the "DIP Order"). Without limitation, the DIP Order shall provide, that (i) the Banks shall be entitled to credit bid the full amount of the Pre-Petition Indebtedness, together with the full amount of the DIP Loan indebtedness, at any Section 363 sale of the Debtor's assets in the Bankruptcy Proceedings; and (ii) neither the Debtor nor any of its affiliates shall file or support (x) any plan of reorganization or (y) any motion to sell any or all of the Debtor's assets in the Bankruptcy |

Proceedings which, in either case, has not been previously approved, in all respects, by the DIP Banks.

(b) A final, nonappealable Order has been entered in the Bankruptcy Proceedings, approving the assumption by the Debtor of all the Tenant Leases identified in Exhibit "A," and approving all the Proposed Cure Amounts identified in Exhibit "B" to the Debtor's Motion for Entry of an Order (1) Authorizing the Assumption of Certain Unexpired Leases, and (2) Approving the Proposed Cure Amounts Related Thereto, docket no. 99, filed on July 31, 2009 (the "Assumption Motion") and granting the Assumption Motion in its entirety.

(c) No bona fide objection (as determined by at least seven of the nine DIP Banks [the "Majority Banks"] ) has been filed challenging (i) the amount, validity, enforceability, or non-avoidability of the Pre-Petition Indebtedness or (ii) the validity, enforceability, perfection, non-avoidability, or seniority of the Pre-Petition Security.

(d) The Court has overruled any objection to the DIP Loan.

**DIP LOAN:** Subject to the terms herein, the DIP Banks shall loan the Debtor the aggregate principal amount of up to $3.7 million, to fund DIP Bank-approved tenant and landlord improvements, leasing commissions, and other Project stabilization and enhancement efforts provided for herein, all in accordance with a budget, acceptable to the Debtor, the Agent, and the DIP Banks. Subject to the terms set forth herein, an approved schedule of the tenant stabilization and enhancement matters, and the costs associated with such efforts, are set forth in Schedule A attached hereto and incorporated herein

**COLLATERAL/PRIORITY OF PAYMENT** All obligations of the Debtor to Agent and/or the DIP Banks under, or in connection with, the DIP Loans shall be secured by (i) a perfected first priority lien on all unencumbered property of the Debtor, (ii) a perfected junior lien on all property of the Debtor (other than the Pre-Petition Security) that was subject to valid and perfected liens in existence at the time of the commencement of the Bankruptcy Proceedings, and (iii) a perfected first priority senior priming lien on all of the Pre-Petition Security, subject only

to (i) at any time of determination, the sum of (x) allowed administrative expenses payable pursuant to 28 U.S.C. § 1930(a)(6) and (y) allowed and unpaid fees, costs, and reasonable expenses of Debtor's counsel (Greenberg Traurig, LLP and Hohmann, Taube & Summers, L.L.P.) for periods and amounts approved in advance by the Majority Banks (the Carve Out). The Carve Out is to be paid out of cash collateral subject to the terms and conditions of use of cash collateral set forth above.

The DIP Loan shall constitute a super priority administrative claim against the Debtor and its estate in the Bankruptcy Proceedings which is an administrative expense claim having priority over (a) any and all allowed administrative expenses, and (b) unsecured claims now existing or hereinafter arising, including, without limitation, administrative expenses of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), and 1113 or 1114 of the Bankruptcy Code, subject only to the Carve Out.

**MATURITY/PERFORMANCE HURDLES:** The DIP Loan will be due and payable in full at the earliest to occur of (i) December 30, 2009, (ii) the date of closing on the sale of all or substantially all the assets of the Debtor (the "Assets"), (iii) the failure of any condition precedent, or (iv) the occurrence of any "DIP Event of Default", as such term is hereinafter defined (the "DIP Maturity Date").

**DIP EVENTS OF DEFAULT** The occurrence or existence of any of the following events or circumstances shall constitute a "DIP Event of Default":

(i) Any bona fide objection (as determined by the Majority Banks) is filed, challenging (i) the amount, validity, enforceability, or non-avoidability of the Pre-Petition Indebtedness; or (ii) the validity, enforceability, perfection, non-avoidability, or seniority of the Pre-Petition Security.

(ii) The Debtor shall have failed to secure final, nonappealable Orders in the Bankruptcy Proceedings, in form and substance acceptable to the Majority Banks: (a) approving the retention of a broker by October 15, 2009 to market and

sell the Assets; and (b) approving the sale of the Project free and clear of all liens, claims, and encumbrances by December 15, 2009.

(iii) By August 31, 2009, the Debtor shall have failed to have made substantial progress in the resolution, to the satisfaction of the Majority Banks, of the Dillard's stabilization issues.

(iv) By September 15, 2009, the Debtor shall have failed to have made substantial progress in the resolution, to the satisfaction of the Majority Banks, of the Twin Liquors' stabilization issues.

(v) By August 31, 2009, the Debtor shall have failed to have made substantial progress in the resolution, to the satisfaction of the Majority Banks, of the mechanics and materialmen's lien issues confronting the Project (as those issues are defined by Agent).

(vi) The Debtor shall, at any time, propose or support any plan of reorganization that is not acceptable to the Majority Banks.

(vii) The Debtor, or any of its affiliates, shall, at any time, propose or support any motion to sell any or all of the Debtor's Assets in the Bankruptcy Proceedings that is not acceptable to the Majority Banks.

(viii) The Debtor shall have failed, for any reason whatsoever, to have consummated the sale of the Assets and Project by December 30, 2009.

**USE OF PROCEEDS:** The proceeds of the DIP Loan shall be used by the Debtor exclusively for the following purposes:

1. Fund those stabilization and enhancement efforts, as more specifically set forth on Schedule A attached hereto and incorporated herein, under the condition that all such stabilization and enhancement efforts are verified by Agent to the satisfaction of the Majority Banks.

2. Any other purpose agreeable to, and approved by, the Majority Banks.

| | |
|---|---|
| **INTEREST RATES:** | Interest on the DIP Loan shall be payable monthly in arrears at a per annum market interest rate of LIBOR plus 10.00%, however, not to be less than 13.25% per annum. |
| **ORIGINATION AND UNUSED COMMITMENT FEES:** | The Debtor shall pay to Agent, for the ratable account of each DIP Bank in accordance with its specified percentage of the DIP Loan commitment, (i) an upfront origination fee equal to 3.50% of the aggregate amount of the commitment for the DIP Loan, payable in full at the time that the DIP Banks commit to make the DIP Loan, and (ii) an unused commitment fee equal to 1.0% of the aggregate unused amount of the commitment for the DIP Loan, calculated on a daily basis and payable quarterly in arrears. |
| **OUT-OF-POCKET EXPENSES:** | All fees, including legal fees, and all reasonable out-of-pocket expenses associated with the DIP Loan are to be paid by the Debtor at closing of the DIP Loan and monthly thereafter, as applicable. |
| **COLLATERAL:** | All obligations of the Debtor to Agent and/or the DIP Banks under, or in connection with, the DIP Loans shall be secured by (i) a perfected first priority lien on all unencumbered property of the Debtor, (ii) a perfected junior lien on all property of the Debtor (other than the Pre-Petition Security) that was subject to valid and perfected liens in existence at the time of the commencement of the Bankruptcy Proceedings, and (iii) a perfected first priority senior priming lien on all of the Pre-Petition Security. |
| **PAYMENT/FORECLOSURE:** | Upon the DIP Maturity Date, the Pre-Petition Secured Loans and the DIP Loan shall be due and payable in full. If the Debtor is unable to repay the Pre-Petition Secured Loans and the DIP Loans on the DIP Maturity Date (except to the extent that the Project and Assets have been sold pursuant to a Section 363 sale pursuant to the terms herein), the automatic stay shall automatically be modified to permit the Agent and/or the Banks to immediately post the Project and all other collateral for non-judicial foreclosure on the earliest possible date permitted under applicable law and to exercise any or all of their respective rights and/or remedies that would otherwise be available to them under applicable State law. |
| **GOVERNING LAW:** | The Loan Documents shall be governed by the laws of the State of Illinois applicable to agreements made and performed in such State except as otherwise governed by the U.S. Bankruptcy Code. |

068800 000195 DALLAS 2509123.6

## SCHEDULE A

The $3.7 million DIP Facility is comprised of:

(a) $800,000 to stabilize the Dillard's property;

(b) $75,000 to complete the Debtor's build out obligations on the Twin Liquors premises;

(c) $450,000 to reimburse Twin Liquors following their completion of the tenant improvements ("TIs") on the premises;

(d) $85,920 to stabilize the Art Attack tenancy and complete the TIs (if necessary);

(e) $58,320 to stabilize the Jamba Juice tenancy and complete the TIs (if necessary);

(f) $100,480 to stabilize the Tony C's tenancy and complete the TIs (if necessary);

(g) $35,920 to stabilize the Yogurt Planet tenancy and complete the TIs (if necessary);

(h) $69,840 to stabilize the Sotheby's Realty tenancy and complete the TIs (if necessary);

(i) $36,880 to stabilize the Hill Country Fitness tenancy and complete the TIs (if necessary);

(j) $252,380.12 to stabilize the Pei Wei tenancy and complete the TIs (if necessary);

(k) up to $1 million[2] to resolve potential valid, perfected, priming contractors' liens attaching to the fee estate of the Debtor in the Project (if necessary); and

(l) up to $1 million to complete the Enhancement Efforts (as are required to increase the occupancy rate to an acceptable level).

---

[2] Items (a) – (j) total $1,964,740.10. The remaining $1,735,259.90 of remaining DIP Facility is available for the resolution of certain contractors' liens against the project and enhancement efforts at the project level, each category capped at the $1 million level. The Debtor will use its best efforts to secure rent abatements in lieu of cash payments for tenant improvements where such abatements do not require any further modifications to the existing leases and are prudent in the judgment of the Debtor.. To the extent that such efforts result in rent abatements in lieu of cash payments, the funds otherwise earmarked for tenant improvements shall be available to apply to the contractors' liens and enhancement efforts subject to the same $1 million cap for each category.